IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01375-MEH

RHONDA PATTERSON-EACHUS,

      Plaintiff,

v.

UNITED AIRLINES, INC.

      Defendant.

_____

## DEFENDANT UNITED AIRLINES' SUMMARY JUDGMENT MOTION
_____

Defendant United Airlines, Inc., by and through its counsel Cathy Havener Greer and Kathryn A. Starnella of Wells, Anderson & Race LLC, respectfully submit the following Fed. R. Civ. P. 56 Summary Judgment Motion.

## INTRODUCTION

For 34 years, Plaintiff Rhonda Patterson-Eachus's employment with United Airlines has been at-will. While Plaintiff received generally positive performance reviews during her five years as a Supervisor of Airport Operations, several of Plaintiff's subordinates felt she berated, belittled and harassed them—unbeknownst to United. Because these subordinates feared retaliation from Plaintiff, none reported their concerns about Plaintiff. United learned of the subordinates' concerns when it conducted an internal investigation in response to anonymous complaints that emerged following divisive messages Plaintiff had posted to Facebook, where some of her subordinates were her "friends." Based on the information obtained in the

investigation, senior management concluded that Plaintiff's disrespectful, inconsistent, and harsh interactions with her subordinates irreparably damaged her standing as a leader and her ability to lead. Accordingly, in accordance with United's Working Together Guidelines, senior management elected to accelerate discipline to termination. And per policy, Plaintiff was terminated without travel benefits.

Despite the evidence, Plaintiff maintains that United discriminated against her because of her gender and age in violation of federal and state law (Claims 1, 2, and 5). She also maintains that United violated the Stored Communications Act, 18 U.S.C. § 2701 (Claim 3); Colorado's Lawful Off-Duty Activities Statute, Colo. Rev. Stat. § 24-34-402.5 (Claim 4); and Colo. Rev. Stat. § 8-2-108 regarding protections for certain political activity (Claim 6). Further, Plaintiff maintains that United wrongfully discharged her in violation of Colorado public policy (Claim 7) and breached an implied employment contract (Claim 8). Summary judgment in United's favor is warranted because the evidence fails to support Plaintiff's claims and no reasonable juror could find in Plaintiff's favor.

### MOVANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

*Plaintiff's At-Will Employment at United*

1.      United hired Plaintiff Rhonda Patterson-Eachus on September 21, 1986. **Ex. A, Employee Profile, UAL 1131-1135 at 1131.**

2.      United is an at-will employer, *i.e.*, it may terminate an employee at its discretion, without notice, and with or without cause. **Ex. B, Working Together Guidelines, UAL 71-168 at 74.**

3.      When Plaintiff applied to work at United, she signed an acknowledgment of understanding that her employment with United "may be terminated by United Airlines or by [her] at any time[.]" **Ex. C, Plaintiff's Ground Support Employment Application, UAL 1108**

4.      On October 3, 1999, United promoted Plaintiff to the supervisor level as a team lead for airport operations. **Ex. A at UAL 1133.**

5.       Plaintiff remained at the supervisor level from October 3, 1999, through her termination on October 16, 2017, though her job titles and work groups changed during those 18 years. ***Id*. at UAL 1131-1134.**

6.      When Plaintiff was terminated on October 16, 2017, she was a Supervisor of Airport Operations, a position she held continuously since September 16, 2012. ***Id*. at UAL 1131.**

7.      Between 2012 and 2017, Plaintiff received generally positive performance reviews; however, during her 2016 year-end review, Plaintiff's then-supervisor gave her a "Partially Meets Expectations" rating under the "Models character" category. **Ex. D 2016 Year-End Review, UAL 29-35 at UAL 33.**

8.      On October 31, 2016, a United employee submitted via United's employee helpline an anonymous complaint about Plaintiff's rude and unprofessional behavior and belittling and demeaning interactions with the caller. **Ex. E, Internal Complaint, UAL 331-334 at UAL 331-332.**

9.      In support of the "Partially Meets Expectations" rating for "Models character," Plaintiff's then-supervisor commented that, "[o]nce in a while [she] appear[s] to be highly emotional and comments can come across rude and biting." **Ex. D at UAL 34.**

*United's Working Together Guidelines*

10.     United provides its employees with annual training on its anti-discrimination, anti-harassment, and anti-retaliation policies. **Ex. F, E. Eget Depo. at 52:7-21.**

11.     United's Working Together Guidelines contain the company's policies and procedures on anti-discrimination, anti-harassment, and anti-retaliation. **Ex. B at UAL 83, 90, 94, 96-97.**

12.     United's Working Together Guidelines prohibit employees from sending, receiving, storing, accessing, printing, or disseminating "offensive or harassing statements or language, including any disparagement of others based on any protected category," such as color and race. ***Id*. at UAL 83.**

13.     United's Working Together Guidelines require employees to ensure that their postings "are dignified, respectful, and honest" and informs employees that the company "will investigate complaints about inappropriate postings and, if warranted, take appropriate corrective action." ***Id*. at UAL 85.**

14.      United's Working Together Guidelines requires employees to report offensive workplace behavior, including violations of the Working Together Guidelines. ***Id*. at UAL 97.**

15.     Employees may report offensive workplace behavior in various ways, including: to one's supervisor or manager; to more senior management; to Human Resources or the Employee Service Center; to an anonymous hotline; or to a designated email address. ***Id*. at UAL 97.**

*United's Performance Management Process*

16.     United's Performance Management Process, which applies to supervisor-level employees, consists of midyear and end-of-year reviews, which address performance related to an employee's job in specific categories. ***Id*. at UAL 132.**

17.     To address supervisor-level employees' performance deficiencies, managers may implement a Performance Improvement Process in partnership with Human Resources. ***Id*. at UAL 132.**

18.     Depending on the severity of the performance issue, managers may bypass the Performance Improvement Process and accelerate discipline up to and including termination of employment. ***Id*. at UAL 133; Ex. F, E. Eget Depo. 47:3-8.**

19.     Managers have five options for resolving a supervisor-level employee's performance issues, if automatic termination is unwarranted: coaching/informal counseling; verbal warning; written warning; termination warning letter; and disciplinary or investigative suspensions. **Ex. B at UAL 133-134.**

20.     United's Working Together Guidelines call for termination of employment, in consultation with Human Resources, when the performance improvement process is unsuccessful or when the severity of an incident warrants immediate termination. ***Id*. at UAL 135.**

21.     The Working Together Guidelines permit the termination of an employee with a demonstrated track record of good performance when that employee engaged in egregious conduct. **Ex. F, E. Eget Depo. at UAL 173:4-9.**

*Plaintiff's Facebook Postings*

22.     Sometime in August of 2017, Plaintiff posted to her Facebook page her support for preserving the Rebel mascot of her high school, Weld Central High, along with an image of the Rebel mascot and a Confederate flag behind it (the "Rebel mascot posting"). **Ex. G, Plaintiff's Facebook Posting, UAL 341.**

23.     Sometime in August of 2017, Plaintiff also re-posted to her private Facebook page a video of an African American in front of a Confederate flag who opined on the current state of affairs and commented that the Confederate flag is not the cause of the country's troubles (the "Confederate flag posting"). **Ex. H, Photo of Phone with Image, UAL 249.**

24.     In August of 2017, Plaintiff was Facebook friends with other United employees, including employees she supervised at the time. **Ex. I, R. Patterson-Eachus Depo. at 66:17-67:4.**

25.     On August 23, 2017, at about 10 p.m., one of Plaintiff's colleagues advised her that her Facebook postings offended one of the African American customer service agents whom Plaintiff supervised and had friended on Facebook. **Ex. I, R. Patterson-Eachus Depo. at 44:11-13, 45:13-19, 47:25-48:4.**

26.     A few hours later, on August 24, 2017, at 12:28 a.m., Plaintiff sent email notification to Ed Eget, Denver hub's Senior Manager of Human Resources and Employee Engagement, about her offensive Facebook posts. **Ex. J, Plaintiff-Eget email chain, UAL 977.**

27.     On August 24, 2017, at 5:14 p.m., Mr. Eget informed Plaintiff by email that she should remove the Confederate flag posts. **Ex. K, Eget-Plaintiff email, UAL 206-07.**

28.     On August 24, 2017, at 8:08 p.m., Plaintiff informed Mr. Eget by email that she removed the Facebook post regarding her high school mascot and that the re-posted video of an African American in front of a Confederate flag was no longer on her Facebook page due to possible removal by the original poster. *Id.* **at UAL 206.**

29.     About four hours later, Plaintiff emailed Mr. Eget her Facebook log-in information, which Mr. Eget did not request. **Ex. I, R. Patterson-Eachus Depo. at 78:5-24; 79:15-22; Ex. F, E. Eget Depo. at 162:18-23.**

30.     Plaintiff sent Mr. Eget her Facebook log-in information to prove that she removed the offending postings and because she "was that desperate to try to prove to United that . . . [she] wasn't trying to hide anything" to "save [her] job[.]" **Ex. I, R. Patterson-Eachus Depo. at 78:5-24; 79:15-22; Ex. F, E. Eget Depo. at 162:18-23.**

31.     No one told Plaintiff that United would take corrective action if she did not provide her Facebook log-in and password to United's management. **Ex. I, R. Patterson-Eachus Depo. at 79:23-80:2**

32.     Mr. Eget did not use Plaintiff's Facebook log-in information. **Ex. F, E. Eget Depo. at 162:16-23.**

33.     Soon after Plaintiff's Rebel mascot and Confederate flag postings, a Black customer service agent met with Mr. Eget to discuss how those postings hurt and upset her. **Ex. F, E. Eget Depo. at 121:10-18; Ex. I, R. Patterson-Eachus Depo. at 69:13-17.**

34.     On August 29, 2017, Plaintiff's manager, Tamera Mitchell, disciplined Plaintiff, in the form of a documented verbal warning, for Plaintiff's Facebook postings that offended United employees. **Ex. L, Documented Verbal Warning (dated August 29, 2017), UAL 240.**

35.    The documented verbal warning noted that Plaintiff's postings violated United's Working Together Guidelines on Professionalism and Social Networking. ***Id.***

36.    The August 29, 2017, documented verbal warning advised Plaintiff that "[f]urther unacceptable personal conduct or policy violation will result in further disciplinary action up to and including termination." ***Id.***

37.    The next day, on August 30, 2017, a United employee submitted via United's employee helpline an anonymous complaint about Plaintiff's Rebel mascot posting and Confederate flag posting. **Ex. M, Internal Complaint (dated Aug. 30, 2017), UAL 335-339 at 335-337.**

38.    According to the August 30, 2017, anonymous complaint report, the complaining United employee deemed the Rebel mascot and Confederate flag postings racially insensitive, was offended, and did not believe that she received honest, fair treatment from Plaintiff as her supervisor. ***Id.***

***Plaintiff's Facebook Postings Trigger an Internal Investigation***

39.    United commenced an investigation in connection with the August 30, 2017, anonymous complaint and it obtained statements from Customer Service agents Plaintiff supervised. **Ex. N, L. David Depo. 39:5-40:7, 59:3-10, 64:1-10; Ex. F, E. Eget Depo. 131:12-16.**

40.    During the internal investigation regarding the August 30, 2017, anonymous complaint, senior management at United's Denver hub interviewed approximately 14 customer service agents who were Black, Hispanic, and/or older and Airport Operations Supervisors

regarding their interactions with Plaintiff. **Ex. F, E. Eget Depo. at 115:12-21, 131:7-132:17, 181:14-182:1.**

41.     On September 12, 2017, senior management, human resources, and a union representative met with several customer service agents in a conference room to discuss Plaintiff's prior interactions with them. **Ex. O, P. Hettlinger Affid., at ¶ 9.**

42.     The customer service agents who participated in the September 12, 2017, meeting with senior management, human resources, and a union representative were a diverse group: some were Black, some were Hispanic, and some were older white employees. ***Id.***

43.     Customer service agents identified multiple berating, belittling, and harassing interactions with Plaintiff, including: **Ex. F, E. Eget Depo. at 161:12-24.**

      a.     Plaintiff's premature and hasty involvement in a passenger-related situation without listening to information from an employee and subsequent blaming and admonishment of the employee for purportedly providing insufficient information. **Ex. O, P. Hettlinger Affid., at ¶ 11.**

      b.     Plaintiff's admonishment of a Latino employee who just returned from military leave and had not met a United plane that arrived at the gate *before* his shift start time. ***Id.***

      c.     Plaintiff's decision to block the same Latino employee's ability to trade shifts as discipline for that employee's failure to assist with a diverted flight after he had just completed processing of an oversold flight and clocked out from a 16-hour workday. ***Id.***

      d.     Plaintiff's request that a Black customer service agent rub her feet during a meeting of the shift leads. ***Id.***

      e.     Plaintiff's admonishment of a Black customer service agent for wearing a uniform coat and demand for the coat's removal followed by an accusation that the agent made Plaintiff look like a fool when she did not realize that the coat qualified as United uniform attire. **Ex. O, P. Hettlinger Affid., at ¶ 7.**

      f.     Plaintiff's decision to post on Facebook a photo of a white person with either black makeup or dirt on the person's face after the race-related riots in Charlottesville, Virginia in August 2017. **Ex. O, P. Hettlinger Affid., at ¶ 8.**

44.     During the September 12, 2017, meeting with senior management, human resources, and a union representative, several of the customer service agents displayed great emotion, frustration, and distress as they discussed Plaintiff's interactions with and impact on them, including how Plaintiff's Facebook postings triggered past trauma from racist violence their relatives experienced. **Ex. F, E. Eget Depo. 173:14-24; Ex. O, P. Hettlinger Affid., at ¶ 10.**

45.     During the September 12, 2017, meeting, customer service agents explained that they did not come forward earlier with their complaints about Plaintiff because they feared she would retaliate against them. **Ex. N, L. David Depo. 64:1-10; Ex. O, P. Hettlinger Affid., at ¶ 10.**

46.     On September 12, 2017, after senior management's group meeting with several customer service agents, Luke David (Managing Director Airport Operations/Customer Service) and Pam Hettlinger (then-Human Resources Manager) met with Plaintiff to inform her that they were commencing an internal investigation on her that was unrelated to the problematic

Facebook postings and that Plaintiff needed to be "taken out of service," *i.e.*, placed on paid leave, for the investigation's duration. **Ex. O, P. Hettlinger Affid., at ¶ 12.**

47.    United holds its leadership employees, including supervisor-level employees such as Plaintiff, to a higher standard, especially with respect to fostering an environment of dignity and respect. **Ex. N, L. David Depo. at 79:22-80:5.**

48.    United's internal investigation of Plaintiff's conduct impressed upon decision-makers such as Mr. David and Ed Eget (Senior Manager of Human Resources and Employee Engagement) that Plaintiff's disrespectful, inconsistent, and harsh interactions with several customer service agents irreparably damaged her standing as a leader and her ability to lead employees she had hurt and inappropriately treated. **Ex. N, L. David Depo. at 79:22-80:5; Ex. F, E. Eget Depot. at 17:16-18.**

49.    On September 27, 2017, Mr. Eget, Ms. Hettlinger, and Charlette Norfleet, a Manager, met with Plaintiff to discuss the investigation and customer service agents' expressed concerns about their interactions with Plaintiff—including Plaintiff's request that a Black customer service agent rub her feet—, their fears of Plaintiff's retaliation against them, and to give Plaintiff an opportunity to respond. **Ex. F, E. Eget Depo. at 127:19-128:22; Ex. O, P. Hettlinger Affid., at ¶ 13.**

50.    During the September 27, 2017, meeting with Mr. Eget, Ms. Hettlinger, and Ms. Norfleet, Plaintiff expressed surprise that certain customer service agents were offended and/or hurt by her interactions with them, became defensive, and denied or diminished the substance or nature of her reported interactions with them. **Ex. O, P. Hettlinger Affid., at ¶ 13.**

*Plaintiff's Termination*

51.     On October 16, 2017, Ms. Norfleet and Ms. Hettlinger met with Plaintiff, informed her of her termination, and gave Plaintiff a copy of her termination letter, which explained the reasons for Plaintiff's termination. **Ex. O, P. Hettlinger Affid. ¶ 14; Ex. P, Termination Letter, UAL 52-53.**

52.     During the October 16, 2017, separation meeting with Plaintiff, Ms. Hettlinger emphasized that Plaintiff's Facebook postings were not the cause of her termination; rather, Plaintiff's course of conduct and interactions with her subordinates, which the internal investigation revealed, led to Plaintiff's termination.  **Ex. O, P. Hettlinger Affid. ¶ 14; Ex. P, Termination Letter, UAL 52-53.**

53.     Following United's internal investigation, senior management concluded that Plaintiff's conduct violated six of United's Working Together Guidelines provisions: (i) treat each other with mutual respect; (ii) communicate and perform all duties in a safe, courteous, helpful, competent, and dependable and businesslike manner; (iii) maintain a professional appearance while on duty or representing United to the public; (iv) act in ways that reflect favorably upon the company, on the employee, and on the employee's peers; (v) use good judgment and open communication in all decisions; and (vi) refrain from aggressive or threatening behavior, whether through words or actions. **Ex. P, Termination Letter, UAL 52-53; Ex. B, Working Together Guidelines, at UAL 77-78.**

54.     Based on the internal investigation's findings, senior management, and human resources concluded that Plaintiff's conduct warranted termination. **Ex. F, E. Eget Depo. at 129:5-10, 152:23-153:4.**

55.     The October 16, 2017, termination letter advised Plaintiff that she is ineligible for rehire with United or any related entity and ineligible for any form of travel benefits. **Ex. P, Termination Letter, UAL 52-53**

56.     Generally, when United terminates an employee for cause, that employee is ineligible for flight benefits. **Ex. F, E. Eget Depo. at 147:10-15;** *see also* **Ex. B, Working Together Guidelines, UAL 145 (noting that involuntarily terminated employees are ineligible for any form of pass travel).**

57.     On October 24, 2017, Plaintiff appealed her termination, and, following an internal hearing before a neutral panel in Houston, hearing officers upheld the termination. **Ex. Q, Appeal, RPE 1-3; Ex. I, Patterson-Eachus Depo. at 129:17-19 (appeal in Houston); Ex. R, 12/20/17 Termination Appeal Decision Letter, RPE 84;** *see also* **Ex. F, E. Eget Depo. at 144:19-25** (noting that a neutral panel considered Plaintiff's appeal and upheld the termination decision).

## STANDARD OF REVIEW

Summary judgment shall be granted if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence" in support of the nonmoving party's position is

insufficient to overcome a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. at 252.

## ARGUMENT

I.      **No evidence demonstrates that United discriminated against Plaintiff because of her gender in violation of Title VII and CADA (Claims 1 and 5).**

To prevail on her gender discrimination claims under Title VII and CADA, Plaintiff must first establish a *prima facie* case of gender discrimination, by a preponderance of evidence that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) her performance was satisfactory; and (4) she was treated less favorably than her male counterparts. *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1379 (10th Cir. 1994); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Colo. Civil Rights Comm'n v. Big O Tires*, 940 P.2d 397, 399-400 (Colo. 1997) (applying *McDonnell Douglas* framework to CADA claim). If Plaintiff establishes a *prima facie* case, then United must articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802.

Once United articulates a legitimate, nondiscriminatory reason for its actions, then Plaintiff must show that United's explanation is pretextual, *i.e.*, so weak, implausible, inconsistent, incoherent, or contradictory. *McDonnell Douglas*, 411 U.S. at 804-05; *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010). A plaintiff may demonstrate pretext in one of three typical ways: "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to

company practice when making the adverse employment decision affecting the plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Plaintiff cannot establish a *prima facie* case for at least three reasons. First, evidence supports United's pre-termination conclusion that her conduct irreparably damaged her ability to lead her subordinates. During a September 12, 2017, meeting with several customer service agents, senior management and a union representative heard of multiple examples where Plaintiff berated, belittled, and harassed her subordinate customer service agents. ***See* Facts, ¶ 43.** Senior management witnessed visible emotion, frustration, and distress as the customer service agents recounted their interactions with Plaintiff and expressed fear of retaliation from Plaintiff. **Facts, ¶¶ 45, 46.** While Plaintiff might question the customer service agents' veracity, courts may not consider "whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and Cty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (modifications omitted). Here, the decisionmakers honestly believed the customer service agents and the examples they provided of Plaintiff's problematic conduct as a supervisor, and the decisionmakers acted in good faith upon that belief. This good faith belief is fatal to any pretextual argument by Plaintiff. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) (rejecting the plaintiff's assertions that her employer's decision was "unwise" and rested on "questionable judgment" because the employer "relied, honestly and in good faith, upon the appearance of improprieties arising from the evidence gathered" in an internal investigation).

Second, United's termination decision complied with the company's Working Together Guidelines. United's Working Together Guidelines expressly identify the company's

expectations for workplace conduct: no discrimination, no harassment, and no retaliation. *See Facts*, ¶ **11.** The Guidelines prohibit employees from harassing or disparaging others because of their color, race, and any other protected category or for any other reason. *Id*. Those Guidelines require employees to treat each other with mutual respect; communicate and perform all duties in a safe, courteous, helpful, competent, and dependable and businesslike manner; and act in ways that reflect favorably upon the company. **Facts, ¶¶ 12, 13, 53.** Under those Guidelines, managers of supervisor-level employees, such as Plaintiff, may bypass the Performance Improvement Process, an incremental approach to address performance issues, and accelerate discipline to and including termination of employment. **Facts, ¶ 18, 21.** The Guidelines also permit the termination of an employee with a track record of good performance when that employee engaged in egregious conduct. **Facts, ¶ 21.** United holds its leadership employees, including supervisor-level employees, to a higher standard, especially with respect to fostering a work environment of dignity and respect. *See* **Facts, ¶ 47.** Because Plaintiff was a supervisor, United held her to that higher standard.

Third, no evidence exists that United acted contrary to an unwritten policy or contrary to company practice when it terminated Plaintiff. By October 16, 2017, decision-makers at United completed an internal investigation of Plaintiff's interactions with several of her subordinates concluded that Plaintiff fell irreparably short of that higher standard and had permanently damaged her ability to lead her subordinates. *See* **Facts, ¶¶ 39-54.** United commenced that investigation after customer service agents and anonymous individuals complained about Plaintiff's interactions with them. *See* **Facts, ¶¶ 33, 37-39.** As part of the investigation, senior staff met with several of the customer service agents Plaintiff supervised. *See* **Facts, ¶¶ 33, 39-**

**45.** Several of the agents displayed great emotion, frustration, and distress as they discussed their interactions with Plaintiff. *See* **Facts, ¶ 44.** The investigation revealed that Plaintiff berated, belittled, and harassed several of her subordinates. *See* **Facts, ¶ 43.** In one instance, Plaintiff admonished an employee for purportedly providing insufficient information about a customer situation when, to the contrary, Plaintiff refused to listen to the information the employee sought to provide. *See* **Facts, ¶ 43(a).** In another instance, Plaintiff admonished an employee who failed to meet an incoming plane that arrived at a gate *before* that employee's shift start time. *See* **Facts, ¶ 43(b).** On another occasion, Plaintiff admonished an employee for wearing a coat and demanded the coat's removal, but then ridiculed the employee for making her look like a fool when she later learned the coat was uniform attire. *See* **Facts, ¶ 43(e).** In yet another instance, Plaintiff asked a Black customer service agent to rub her feet during a meeting. *See* **Facts, ¶ 43(d).**

On October 16, 2017, as a result of the internal investigations' findings, United terminated Plaintiff's employment. *See* **Facts, ¶¶ 51-55.** On that same date, United issued a termination letter, which identified the reasons for its termination decision, including the irreparable damage Plaintiff had done to her workplace relationships and her violation of six Working Together Guidelines provisions. *See* **Facts, ¶¶ 51-53.** When Ms. Hettlinger and Ms. Norfleet met with Plaintiff on October 16, 2017, they advised her of the reasons for her termination, namely her course of conduct and interactions with her subordinates. *See* **Facts, ¶¶ 51-52.** United's termination letter, dated October 16, 2017, identified those same reasons for Plaintiff's termination. *See*, *e.g.*, **¶¶ 51, 53.**

Based on this evidence, no reasonable juror could conclude that United terminated Plaintiff without benefits for illegitimate, discriminatory reasons or that United's reasons for that decision are so weak, implausible, inconsistent, incoherent, or contradictory. In an attempt to prove United's mendacity, Plaintiff may point to her five-year tenure as a Supervisor of Airport Operations with generally positive performance reviews. ***See* Facts, ¶ 7.** United terminated Plaintiff for her specific conduct, however. Indeed, the Working Together Guidelines permit the termination of an employee who engaged in egregious conduct even if that employee has a demonstrated track record of good performance. ***See* Facts, ¶ 21.**

Additionally, United has repeatedly informed Plaintiff of the reasons for its decision to terminate her and those have remained consistent. Thus, this case is unlike the situation presented in *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005), where the court reversed summary judgment for the employer because the district court disregarded the post-hoc—and, therefore, pretextual—nature of the employer's justifications for the termination decision. 405 F.3d at 1103. For example, in *Plotke*, the decisionmakers claimed she underperformed and engaged in misconduct, but they never raised those concerns with her and the proffered reasons for termination changed. *Id*. Additionally, the decisionmakers never conferred with the plaintiff's supervisor about the termination decisions. *Id*. For these reasons, no reasonable juror could conclude that United's asserted reasons for the termination decision are pretextual.

**II.     No evidence demonstrates that United discriminated against Plaintiff because of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), *et seq*. and CADA (Claims 2 and 5).**

The same *McDonnell-Douglas* burden-shifting framework that applies to Title VII gender discrimination claims applies to ADEA and CADA age discrimination claims. *See O'Connor v.*

*Consol. Coin Caterers Corp.*, 517 U.S. 308, 310-311 (1996); *Frank v. City of Fort Collins*, No. 18-cv-03204, 2019 U.S. Dist. LEXIS 140480, at **21-23 (D. Colo. Aug. 20, 2019) (unpublished) (noting *McDonnell-Douglas* burden-shifting framework's application to age-discrimination CADA claims). To demonstrate a *prima facie* age discrimination claim, Plaintiff must prove that: (1) she was at least 40 years old; (2) she was terminated; and (3) the termination was because of her age. *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 992 (10th Cir. 2005).

If Plaintiff demonstrates a *prima facie* case, the burden shifts to United to present, "in a reasonably specific and clear manner, some legitimate, nondiscriminatory reason for the employee's [termination]." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994) (internal quotations and citation omitted). The burden then shifts back to Plaintiff to demonstrate that United's decision was based on age discrimination, either with direct evidence of discrimination or by demonstrating the pretextual nature of United's reasons for termination. *Id*.

Summary judgment in United's favor is warranted because no evidence exists that Plaintiff's termination was *because of* her age. To the contrary, irrefutable evidence demonstrates that Plaintiff was terminated because of her *conduct*, which irreparably damaged her ability to lead her subordinates. *See supra* Section I. United has remained consistent in its reasons for its termination decision: it articulated those reasons during the October 16, 2017, separation meeting; in the October 16, 2017, termination letter; and during United's 30(b)(6) depositions. Additionally, the Working Together Guidelines support United's decision to terminate Plaintiff for her conduct even though she had generally positive performance reviews. Accordingly, no reasonable juror could conclude that United's proffered reason for terminating Plaintiff is

pretextual. *Cf. Whittington*, 429 F.3d at 994 (identifying procedural irregularities and inconsistent explanations as evidence of pretext in an age discrimination suit).

### III.    No evidence demonstrates that United violated the Stored Communications Act, 18 U.S.C. § 2701 (Claim 3).

Plaintiff claims that United violated the provisions of the Stored Communications Act, 18 U.S.C. § 2701, when it "access[ed] [her] private pages stored on Facebook, without permission, and us[ed] improperly accessed electronic communications to wrongfully discharge [her]." Complaint, Doc. # 1 at ¶ 61; *see also id.* at ¶ 41 (alleging that, "[w]hile under suspension, to restore her good name [Plaintiff] felt pressured to provide United her Facebook username and password or private pages stored on her Facebook account").

The Stored Communications Act prohibits: (1) "intentional[ ] access without authorization [to] a facility through which an electronic communication service is provided"; or (2) "intentional exce[ss] [of] an authorization to access that facility [to obtain], alter[ ], or prevent[ ] authorized access to a wire or electronic communication while it is in electronic storage in such system[.]" 18 U.S.C. § 2701(a). "Electronic storage" means: "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.* at § 2510(17). A plaintiff must demonstrate that the alleged violator acted "with a knowing or intentional state of mind[.]" *Id.* at § 2707(a).

Summary judgment in United's favor on Claim 3 is warranted because there is no evidence that United accessed Plaintiff's private Facebook pages. Mr. Eget testified that "[Plaintiff] sent me a [Facebook] password . . . but I would not have accessed that because I have

no right to go into anybody's Facebook page, regardless [of] whether they send me their password or not." **Ex. F, E. Eget Depo., 162:18-23**. Additionally, during her deposition, Plaintiff explained why she *chose* to give Mr. Eget her Facebook password even though he did not ask for it:

> I was desperate. I felt like drowning. I felt like I could not – I didn't know how to prove my innocence other than to share everything I had. I would have given up my first-born child. I mean, I was that desperate to try to prove to United that I – I wasn't trying to hide anything . . . . And that's why I gave my name, my password, everything . . . to Facebook, telling him, "Read it, check, go back, look.

**Ex. I, R. Patterson-Eachus Depo., 78:5-24.**

Simply put, Mr. Eget did not access Plaintiff's Facebook page or compel Plaintiff to provide him the log-in information. The evidence does not support a violation of 18 U.S.C. § 2701.

### IV.    No evidence demonstrates that United violated Colorado's Lawful Off-Duty Activities Statute, Colo. Rev. Stat. § 24-34-402.5 (Claim 4).

Plaintiff claims that United violated Colorado's Lawful Off-Duty Activities Statute, Colo. Rev. Stat. § 24-34-402.5, because it terminated Plaintiff "due to [her] engaging in . . . lawful activity [*i.e.* posting commentary on Facebook about her high school's Rebel mascot and the Confederate flag] off the premises of the employer during nonworking hours[.]" Complaint, Doc. # 1, at ¶ 62.

Colorado's Lawful Off-Duty Activities Statute "is an exception to an employer's general right to terminate an at-will employee without legal consequence" and it serves "to keep an employer's proverbial nose out of an employee's off-site off-hours business[.]" *Williams v. Rock-Tenn Servs.*, 370 P.3d 638, 640 (Colo. App. 2016). It prohibits the termination of an employee for that employee's "lawful activity off the premises of the employer during

nonworking hours," except in one of two circumstances: (1) the employer's restriction on that lawful activity "[r]elates to a bona fide occupational requirement *or* is reasonably and rationally related[1] to the employment activities[2] and responsibilities of a particular employee or a particular group of employees"; or (2) "[i]s necessary to avoid a conflict of interest with any responsibilities to the employer or the appearance of such conflict of interest." COLO. REV. STAT. § 24-34-402.5(1) (emphasis added).

Summary judgment in United's favor is warranted because there is no evidence that Plaintiff was terminated for her Facebook postings. The October 16, 2017, termination letter identified exactly why Plaintiff was terminated, namely:

- Several of Plaintiff's subordinates reported to senior management that Plaintiff "bullied, harassed, discriminated against, and retaliated against them."

- Several of Plaintiff's subordinates "identif[ied] many situations where [they] felt [Plaintiff] treated them more harshly as a result of their race or color."

- Plaintiff's "treatment of various employees of color violated [United's] Anti-Harassment and Discrimination Policy and [six] Working Together Guidelines": (1) treat each other with mutual respect; (2) communicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner; (3) maintain a professional appearance while on

---

[1] "Reasonably and rationally related employment activities" means "those that necessarily are not in direct conflict with the essential business-related interests of the employer." *Williams*, 370 P.3d at 643 (internal citation and quotations omitted).

[2] "Employment-related activities" means "those that have an inherent connection with employment and emanate from the duties of the job." *Id.*

- duty or representing United to the public; (4) act in ways that reflect favorably upon the company, oneself and one's peers; (5) use good judgment and open communications in all decisions; and (6) refrain from aggressive or threatening behavior, whether through words or actions.

**Ex. P, 10/16/17 Termination Letter, UAL 52-53**. Simply put, United did not terminate Plaintiff because of her off-duty, off-premises Facebook postings. *See* **Ex. F, E. Eget Depo. 118:20-24** ("I wouldn't fire anybody for just a post. It was really all the subsequent investigation that went along with the post . . . that made the final decision."); **Ex. N, L. David Depo. 44:24-45:1** ("we did not have the view that [the Facebook postings] in and of itself was something that required further action"). Management's decision rested on its conclusion that "there was just no trust and no respect and [Plaintiff] wouldn't be able to lead people[.]" **Ex. F, E. Eget Depo. 115:7-14.** Though the termination letter referenced Facebook postings, it did so to identify the internal investigation's impetus and to underscore Plaintiff's continued blindness and disregard for her conduct's impact on others. ***Id.***

Even if United had terminated Plaintiff for her Facebook postings, Colorado's Lawful Off-Duty Activities Statute permits "employers to require certain high profile [sic] members of their staff from foregoing involvement in activities that would call into question their competence." *Marsh v. Delta Air Lines, Inc.*, 952 F. Supp. 1458, 1463 (D. Colo. 1997). United's prohibition on racially insensitive and harassing social media postings is reasonably and rationally related to Plaintiff's employment activities and responsibilities as a supervisor. United expressly requires employees "to treat co-workers . . . with dignity and respect" in the social networking context and to "[e]nsure that . . . postings are dignified, respectful and honest." **Ex.**

**B, Working Together Guidelines, UAL 85.** United holds its supervisor-level and other leadership employees to a higher standard because those employees are the ones who need to set the example of appropriate conduct and to create and to foster an environment of dignity and respect among employees. **Ex. N, L. David Depo. at 79:22-80:5;** *see also* **Ex. F, E. Eget Depo. at 48:11-19.** Plaintiff's racially insensitive Facebook postings call into question Plaintiff's competence to supervise a racially diverse group of customer service agents. No reasonable jury would conclude otherwise. Just as Colorado's statute offers no recourse to a plant manager who was terminated for vacationing instead of attending a post-audit meeting to analyze a failed audit under his watch, *Williams*, 370 P.3d at 643, Colorado's statute offers no recourse to Plaintiff who revealed her personal opinions about racially charged topics via social media posts accessible by at least some of her subordinates.

> **V.    No evidence demonstrates that United unlawfully prohibited Plaintiff from engaging in political activity in violation of Colo. Rev. Stat. § 8-2-108 (Claim 6).**

Plaintiff claims that United violated Colo. Rev. Stat. § 8-2-108 because it forbade her from, and terminated her for, "engaging in or participating in politics" or "political activity." Complaint, Doc. # 1, ¶¶ 1, 21, 64. Plaintiff identifies the at-issue "political activity" as her private Facebook postings regarding her support for her high school's Rebel mascot and of a "video of an African American male opining in front of a confederate flag about how things are getting out of hand and that the flag is not the cause of the country's troubles." *Id*., at ¶¶ 21, 22; *see also* **Ex. I, Patterson-Eachus Depo. at 36:9-37:2** (equating her commentary on her high school mascot and on the Confederate flag to politics).

Colo. Rev. Stat. § 8-2-108(1) prohibits employers from "mak[ing], adopt[ing], or enforc[ing] any rule, regulation, or policy forbidding or preventing any . . . employees from engaging or *participating in politics* or from *becoming a candidate for public office* or being *elected to and entering upon the duties of any public office*." (emphasis added.) Employees may seek damages from their employer for injuries suffered due to an employer's violation of the statute. COLO. REV. STAT. § 8-2-108(2).

United assumes for purposes of this motion only that Plaintiff's Rebel mascot and Confederate flag postings constitute political activity. Summary judgment in United's favor is warranted, however, because Plaintiff was not terminated *because of* her Facebook postings. Plaintiff was terminated, rather, because of her pattern of rude, belittling, harassing, berating conduct with several of her subordinates, which United concluded irreparably damaged her ability to lead her subordinates and to instill trust in her team. Further, United has no rule, regulation, or policy that forbids or prevents employees from participating in politics. United's Working Together Guidelines, rather, require employees to exercise good judgment on social media; to avoid posting comments that could damage United's reputation, especially if they infer or imply an endorsement by United; to treat workers with dignity and respect on social media; and for managers to consider the appropriateness of being social media "friends" with subordinates. **Ex. B, Working Together Guidelines, UAL 84-85.**

### VI.     No evidence demonstrates that United wrongfully discharged Plaintiff in violation of Colorado public policy (Claim 7).

In support of Claim 7, Plaintiff claims that United "wrongfully discharged [her] in violation of Colorado public policy." Complaint, Doc. # 1, ¶ 65. Specifically, Plaintiff claims

that United terminated her in retaliation for her "initial[ ] fail[ure] to cease lawful off-duty or political activity as directed by [United] or for engaging in [that activity]." *Id.*, ¶ 68.

Wrongful discharge claims are a judicially-crafted exception to the at-will doctrine. *See Crawford Rehab. Servs. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997). This exception "is grounded in the notion that an employer should be prohibited from discharging an employee with impunity for reasons that contravene widely accepted and substantial public policies," *id.* at 552—such as policies to protect whistleblowers, to protect employees who intervene in fraudulent or other unlawful activity, and to protect employees who refuse to engage in unethical conduct. *See*, *e.g.*, *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992) (refusing to engage in fraudulent conduct); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry*, 232 P.3d 277 (Colo. App. 2010) (challenging work schedule that violated wage and hour laws); *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496 (Colo. App. 2008) (concerning a whistleblower).

Wrongful discharge is an action "that involves a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; leads to an outrageous result clearly inconsistent with a stated public policy; or strikes at the heart of a citizen's social rights, duties, and responsibilities." *Id.* (internal citations and quotation marks omitted). Simply put, the employer must have discharged an employee for "behavior that truly impacts the public in order to justify [the Court's] interference into an employer's business decisions," including interference with the at-will employment arrangement. *Id.* (citation omitted).

To prevail on her wrongful discharge claim, Plaintiff must prove the following: (1) that United prohibited Plaintiff "from performing a public duty or exercising an important job-related right or privilege"; (2) "that the action directed by [United] would . . . undermine a clearly

expressed public policy relating to [Plaintiff's] basic responsibility as a citizen or [Plaintiff's] right or privilege as a worker"; (3) that Plaintiff "was terminated as the result of refusing to perform the act directed by [United]"; and (4) United "was aware or reasonably should have been aware, that the [Plaintiff's] refusal to comply with [its] order or directive was based on [Plaintiff's] reasonable belief that the action ordered by [United] was illegal, contrary to clearly expressed statutory policy relating to [Plaintiff's] duty as a citizen, or violative of [Plaintiff's] legal right or privilege as a worker." *Mariani v. Rocky Mountain Hosp. & Med. Serv.*, 902 P.2d 429, 433 (Colo. App. 1994) (internal citations and quotations omitted).

Summary judgment in United's favor is warranted for at least two reasons. First, as already discussed above in Section I, there is no evidence that United terminated Plaintiff because of her Facebook postings. Second, Plaintiff's personal opinions about her high school Rebel mascot and the Confederate flag do not "truly impac[t] the public" and are of "[in]sufficient gravity to outweigh the precepts of at-will employment." *Weissman*, 938 P.2d at 552-53. Plaintiff's *alleged* termination because of her Facebook postings does not support a "claim for public-policy wrongful discharge" because those postings do not "relat[e] to the public health, safety, or welfare, or [otherwise] relat[e] to [Plaintiff's] rights as a worker." *Id.* at 553 (finding no wrongful discharge claim arising from termination of an employee who exercised her right to call the Division of Labor about rest breaks and took two rest breaks a day).

**VII.    No implied employment contract that changed the at-will nature of Plaintiff's employment exists (Claim 8).**

Plaintiff claims that "[v]arious of [United's] policies, procedures, or other commitments became an implied part of Defendant's offer of employment or the terms or conditions of Plaintiff's regular, full-time employment." Complaint, Doc. #1, at ¶ 70.

To prevail on her implied contract claim, Plaintiff must prove that United's Working Together Guidelines constitute part of United's employment offer and that she accepted employment and performed her employment duties in consideration for United's offer to comply with its Guidelines. *Mariani*, 902 P.2d at 434-35. A plaintiff employee's signed acknowledgment of the at-will nature of employment invalidates a breach of implied contract claim, however. *See id*. at 435.

"[A]bsent an express stipulation as to the length of employment, employment for an indefinite term constitutes an 'at-will' contract which may be terminated at any time by either party." *Id.* at 434 (finding no implied contract because the employer's alleged employment promises did not contain any specific term of employment and did not affect the employer's right to terminate the plaintiff with or without cause); *see also Crawford Rehab. Servs. v. Weissman*, 938 P.2d 540, 546 (Colo. 1997) (noting that "Colorado adheres to the employment at-will doctrine").

Here, United's Working Together Guidelines expressly state:

United is an at-will employer, meaning that an employee may end his or her employment at any time. In addition, this policy enables United to modify or terminate at its discretion and without notice or cause, an employee's employment status, employment hour and work schedule to fit the needs of the organization. The policies in the Working Together Guidelines are not meant to, or should be interpreted to mean to, alter or modify the at-will employment relationship.

**Ex. B, Working Together Guidelines, UAL 74.**

The Working Together Guidelines also expressly declare that "[t]hese guidelines are not a contract of employment." *Id*. **at UAL 74.** Further, the Guidelines warn employees that "[f]ailure to comply with any of these guidelines may result in disciplinary action *up to and including termination of employment*." *Id***.** (emphasis added). Employees are also warned that an incident's severity may warrant "leaders [to] by-pass a performance improvement option and accelerate the discipline up to and including termination of employment." *Id***., UAL 133, 135.**

When Plaintiff applied to work at United on August 28, 1986, she signed an affirmation that she understood that her "employment may be terminated by United Airlines or by [her] at any time[.]" **Facts, ¶ 3.** Thus, 34 years ago, Plaintiff acknowledged the at-will nature of her employment, and the Working Together Guidelines demonstrate that the at-will nature of Plaintiff's employment has not changed. Therefore, summary judgment in United's favor on Claim 8 is warranted.

## CONCLUSION

For the foregoing reasons, summary judgment in United Airlines' favor is warranted.

Dated this 18th day of September, 2020.

Respectfully submitted,

*S/ Kathryn A.Starnella*
Cathy Havener Greer
Kathryn A. Starnella
Wells, Anderson & Race, LLC

1700 Broadway, Suite 1020
Denver, CO 80290
T: 303-830-1212
Email: cgreer@warllc.com
Email: kstarnella@warllc.com
***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 18, 2020, a true and correct copy of the above and foregoing **DEFENDANT UNITED AIRLINES' SUMMARY JUDGMENT MOTION** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following address:

Dipak P. Patel, Esq.
Ciancio Ciancia & Brown P.C. – Broomfield
390 Interlocken Crescent, Suite 350
Broomfield, CO 80021
***Attorneys for Plaintiff***

*S/ April Barrett*
April Barrett
Email: abarrett@warllc.com