IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01375-MEH

RHONDA PATTERSON-EACHUS,

      Plaintiff,

v.

UNITED AIRLINES, INC.,

      Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**

      Plaintiff worked for Defendant for thirty-one years in several capacities, most recently as a supervisor of airport operations.  Her conduct and performance were not an issue until, as Defendant describes it, she posted certain "divisive" messages on Facebook.  Defendant learned of those messages, investigated them, found other issues with Plaintiff's on-the-job conduct, and terminated Plaintiff based on its purported findings that Plaintiff's negative interactions with subordinates irreparably damaged her ability to supervise.  Plaintiff alleges the termination violates (1) age and gender discrimination laws; (2) the Stored Communications Act (SCA), 18 U.S.C. § 2701; (3) Colorado's Lawful Off-Duty Activities Statute, Colo. Rev. Stat. § 24-34-402.5; (4) Colo. Rev. Stat. § 8-2-108 regarding protections for certain political activity; (5) Colorado public policy; and (6) an implied employment contract.  Defendant now moves for summary judgment on all claims.

# FINDINGS OF FACT

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.  In some instances, I have quoted directly from the evidentiary record when a party characterizes the evidence in a way the opposing party disputes.  Further, at times Plaintiff or Defendant denies a fact without any citation to evidence, which is not a proper denial.  In her response brief Plaintiff provides additional facts, and I have incorporated those that I find relevant to the issues before me.  The facts below are numbered consist with Defendant's Motion for Summary Judgment, which cites to the evidence in the record.

1.      Defendant hired Plaintiff on September 21, 1986.

2.      Defendant is an at-will employer.

3.      When Plaintiff applied to work at Defendant, she signed an acknowledgment of understanding that her employment with Defendant "may be terminated by United Airlines or by [her] at any time[.]"

4.      On October 3, 1999, Defendant promoted Plaintiff to the supervisor level as a team lead for airport operations.

5.      Plaintiff remained at the supervisor level from October 3, 1999, through her termination on October 16, 2017, although her job titles and work groups changed during those eighteen years.

6.      When Defendant terminated Plaintiff on October 16, 2017, she was a supervisor of airport operations, a position she held continuously since September 16, 2012.

7.      Between 2012 and 2017, Plaintiff received positive performance reviews, although for one element of her 2016 year-end review, Plaintiff's then-supervisor gave her a "Partially Meets Expectations" rating under the "Models character" category.  In support of this rating, Plaintiff's

supervisor commented: "Once in a while [she] appear[s] to be highly emotional and comments can come across rude and biting."

8.      Plaintiff was among the few employees who certain managers would consider for "upgrades" to "backfill" their position during manager absences, which upper management could approve or disapprove. Qualifications for an employee to be considered for "upgrade" include having good operational knowledge, good communication skills, working with the front line and the supervisors, and having good relationships with subordinate employees.

9.      On October 31, 2016, a United employee submitted via Defendant's employee helpline an anonymous complaint about Plaintiff ("rude and unprofessional behavior" and "belittle[ing]" and "demean[ing]" the complainant).

10.     Defendant provides its employees with periodic training on its anti-discrimination, anti-harassment, and anti-retaliation policies.

11.     Defendant's Working Together Guidelines ("the UAL Guidelines") address the company's policies and procedures on anti-discrimination, anti-harassment, and anti-retaliation.

12.     The UAL Guidelines prohibit employees from sending, receiving, storing, accessing, printing, or disseminating "offensive or harassing statements or language, including any disparagement of others based on any protected category," such as color and race.

13.     The UAL Guidelines require employees to ensure that their postings "are dignified, respectful, and honest" and informs employees that the company "will investigate complaints about inappropriate postings and, if warranted, take appropriate corrective action."

14.     The UAL Guidelines require employees to report offensive workplace behavior, including violations of the Guidelines.

15.     Employees may report offensive workplace behavior in various ways, including: to one's supervisor or manager; to more senior management; to human resources or the Employee Service Center; to an anonymous hotline; or to a designated email address.

16.     Defendant's Performance Management Process, which applies to supervisor-level employees, consists of midyear and end-of-year reviews.  These reviews address performance in specific job duty categories.

17.     To address supervisor-level employees performance deficiencies, managers may implement a performance improvement process in partnership with human resources.

18.     The UAL Guidelines state: "If the severity of an incident warrants it, leaders may bypass a performance improvement option and accelerate discipline up to and including termination of employment."

19.     Managers have five options for resolving a supervisor-level employee's performance issues, if automatic termination is unwarranted: coaching/informal counseling; verbal warning; written warning; termination warning letter; and disciplinary or investigative suspensions.  As a supervisor, Plaintiff herself administered discipline progressively to her subordinates relying on the UAL Guidelines.

20.     The UAL Guidelines call for termination of employment, in consultation with human resources, when the performance improvement process is unsuccessful or when the severity of an incident warrants immediate termination.

21.     Specifically, the UAL Guidelines state: "Termination of employment will occur when . . . the severity of an incident warrants immediate termination."

22.     Sometime in August 2017, on her personal time and computer, Plaintiff re-posted to her private Facebook page her support for preserving the "Rebels" mascot of her high school, Weld

Central High, including a cartoon soldier superimposed on a Confederate flag (the "Rebels mascot post").

23.     Sometime also in August 2017, Plaintiff re-posted to her private Facebook page a video of an African American male in front of a Confederate flag who, among other things, opined that the Confederate flag is not the evil that many people say it is (the "Confederate flag post").

24.     In August of 2017, Plaintiff was Facebook friends with other United employees, including employees she supervised at the time.

25.     On August 23, 2017, at about 10:00 p.m., one of Plaintiff's colleagues advised her that her Facebook postings offended one of the African American customer service agents who Plaintiff supervised and had friended on Facebook.

26.     A few hours later, on August 24, 2017, at 12:28 a.m., Plaintiff sent an email to Ed Eget, Senior Manager of Human Resources and Employee Engagement at United's Denver hub, about her offensive Facebook posts.

27.     On August 24, 2017, at 5:14 p.m., Mr. Eget informed Plaintiff by email that she should remove the Confederate flag post.  Plaintiff avers that the post had already been removed.

28.     On August 24, 2017, at 8:08 p.m., Plaintiff informed Mr. Eget by email that she removed the Facebook post regarding her high school mascot, and that the video was no longer on her Facebook page.

29.     About four hours later, Plaintiff emailed Mr. Eget her Facebook log-in information, which Mr. Eget did not request.

30.     Plaintiff sent Mr. Eget her Facebook log-in information to prove that she removed the offending postings and because she "was that desperate to try to prove to United that . . . [she] wasn't trying to hide anything" to "save [her] job[.]"

31.     No one told Plaintiff that Defendant would take corrective action if she did not provide her Facebook log-in and password to Defendant's management.

32.     Mr. Eget did not use Plaintiff's Facebook log-in information.

33.     Soon after Plaintiff's Rebels mascot and Confederate flag posts, a Black customer service agent met with Mr. Eget to discuss how those postings hurt and upset her.

34.     On August 29, 2017, Plaintiff's manager, Tamera Mitchell, disciplined Plaintiff, in the form of a documented verbal warning, for Plaintiff's Facebook posts that offended Defendant employees.

35.     The documented verbal warning noted that Plaintiff's posts violated the UAL Guidelines on professionalism and social networking.

36.     The documented verbal warning also advised Plaintiff that "[f]urther unacceptable personal conduct or policy violation will result in further disciplinary action up to and including termination."

37.     The next day, on August 30, 2017, a United employee submitted via Defendant's employee helpline an anonymous complaint about Plaintiff's Rebels mascot and Confederate flag posts.

38.     According to the August 30, 2017 anonymous complaint report, the complaining United employee deemed the Rebels mascot and Confederate flag posts racially insensitive, was offended, and did not believe that she received honest, fair treatment from Plaintiff as her supervisor.

39.     Defendant commenced an investigation in connection with the August 30, 2017 anonymous complaint.  It obtained statements from customer service agents Plaintiff supervised. Tammy Mitchell, Plaintiff's then direct reporting manager, was excluded from participating in the internal investigation ostensibly to avoid a conflict of interest because of Ms. Mitchell's perceived close relationship with Plaintiff.  Luke David (Managing Director Airport Operations/Customer

Service) participated in the termination decision despite the fact that his wife, a former United employee, faced a disciplinary charge by Plaintiff.

40.     During the internal investigation, senior management at Defendant's Denver hub interviewed approximately fourteen customer service agents who were Black, Hispanic, and/or older employees and airport operations supervisors, regarding their interactions with Plaintiff.

41.     On September 12, 2017, senior management, human resources, and a union representative met with several customer service agents in a conference room to discuss Plaintiff's prior interactions with them.

42.     The customer service agents who participated in the September 12, 2017 meeting a diverse group: some were Black, some were Hispanic, and some were older white employees.

43.     Defendant's Rule 30(b)(6) representative testified that internal complaints against Plaintiff involved United personnel who "felt picked on or harassed."  Customer service agents identified multiple berating, belittling, and harassing interactions with Plaintiff.   Specific allegations included:

a.     Plaintiff's premature and hasty involvement in a passenger-related situation without listening to information from an employee and subsequent blaming and admonishment of the employee for purportedly providing insufficient information.

b.     Plaintiff's admonishment of a Latino employee who just returned from military leave and had not met a United plane that arrived at the gate before his shift start time.

c.     Plaintiff's decision to block the same Latino employee's ability to trade shifts as discipline for that employee's failure to assist with a diverted flight after he had just completed processing of an oversold flight and clocked out from a sixteen-hour workday.

d.      Plaintiff's request that a Black customer service agent rub her feet during a meeting of the shift leads (which Plaintiff states was completely in jest as understood by everyone in the room).

e.      Plaintiff's admonishment of a Black customer service agent for wearing a uniform coat and demand for the coat's removal followed by an accusation that the agent made Plaintiff look like a fool when she did not realize that the coat qualified as United uniform attire.

f.      Plaintiff's decision to post on Facebook a photo of a white person with either black makeup or dirt on the person's face after the race-related riots in Charlottesville, Virginia in August 2017, which photo Plaintiff states was of her nephew covered in soot after working with metal.  However, although there were 153 entries by Plaintiff in the employee performance system ("EPS"), a sort of incident log, the vast majority of them were in recognition of her subordinates. Of those EPS entries that were performance-based, subordinates had opportunities to challenge Plaintiff's discipline actions but failed to do so.

44.     During the September 12, 2017 meeting, several customer service agents displayed great emotion, frustration, and distress as they discussed Plaintiff's interactions with and impact upon them, including how Plaintiff's Facebook posts triggered past trauma from racist violence their relatives experienced.

45.     During the September 12, 2017 meeting, customer service agents explained that they did not come forward earlier with their complaints about Plaintiff because they feared she would retaliate against them.

46.     On September 12, 2017, after the meeting, Mr. David and Pam Hettlinger (then-Human Resources Manager) met with Plaintiff to inform her that they were commencing an internal investigation on her that was unrelated to the problematic Facebook posts, and that Plaintiff needed to be "taken out of service," *i.e.*, placed on paid leave, for the investigation's duration.

47.     Defendant purports to hold its leadership employees, including supervisor-level employees such as Plaintiff, to a higher standard, especially with respect to fostering an environment of dignity and respect, although Plaintiff asserts that Defendant's discipline is disparate for such employees.

48.     Decision-makers such as Mr. David and Mr. Eget, after Defendant's internal investigation of Plaintiff's conduct was completed, made the determination that Plaintiff's interactions with several customer service agents irreparably damaged her standing as a leader and her ability to lead employees.

49.     On September 27, 2017, Mr. Eget, Ms. Hettlinger, and Charlette Norfleet, a manager, met with Plaintiff to discuss the investigation and customer service agents' expressed concerns about their interactions with Plaintiff, their fears of Plaintiff's retaliation against them, and to give Plaintiff an opportunity to respond. Defendant refused to interview Plaintiff's requested witnesses, foremost among them supervisor Carla Conde.

50.     During the September 27, 2017, meeting with Mr. Eget, Ms. Hettlinger, and Ms. Norfleet, Plaintiff expressed surprise that certain customer service agents were offended and/or hurt by her interactions with them, became defensive, and denied or diminished the substance or nature of her reported interactions with them.  She explained her own understanding of each customer service agent complaint and described the basis for each disciplinary action taken.

51.     On October 16, 2017, Ms. Norfleet and Ms. Hettlinger met with Plaintiff, informed her of her termination, and gave Plaintiff a copy of her termination letter, which explained the reasons for Plaintiff's termination.

52.     During the October 16, 2017 separation meeting, Ms. Hettlinger stated that Plaintiff's Facebook posts were not the cause of her termination; rather, she stated that Plaintiff's course of

conduct and interactions with her subordinates, which the internal investigation revealed, led to Plaintiff's termination.  Plaintiff asserts that testimony by United officials demonstrates that the posts were a consideration in the investigation.

53.     Following Defendant's internal investigation, senior management concluded that Plaintiff's conduct violated six of the UAL Guidelines provisions: (i) treat each other with mutual respect; (ii) communicate and perform all duties in a safe, courteous, helpful, competent, and dependable and businesslike manner; (iii) maintain a professional appearance while on duty or representing Defendant to the public; (iv) act in ways that reflect favorably upon the company, on the employee, and on the employee's peers; (v) use good judgment and open communication in all decisions; and (vi) refrain from aggressive or threatening behavior, whether through words or actions.

54.     Based on the internal investigation's findings, senior management and human resources concluded that Plaintiff's conduct warranted termination.

55.     The October 16, 2017 termination letter advised Plaintiff that she is ineligible for rehire with Defendant or any related entity and ineligible for any form of travel benefits.

56.     Generally, when Defendant terminates an employee for cause, that employee is ineligible for flight benefits.

57.     On October 24, 2017, Plaintiff appealed her termination.  Following an internal hearing before a neutral panel in Houston, the hearing officers upheld the termination.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show

there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense— his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings

themselves.'"   *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).   "The court views the record and draws all inferences in the light most favorable to the non-moving party."   *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.,* 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.      Gender Discrimination (Claims 1 and 5)

Plaintiff asserts gender discrimination under both Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2(a)(1), and the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. § 24–34–402(1)(a).   At the summary judgment stage, for Plaintiff to proceed to trial, she must first establish a prima facie case of gender discrimination, by a preponderance of evidence, that: (1) she is a member of a protected class; (2) she suffered an adverse employment action (here, termination); and (3) the termination took place under circumstances giving rise to an inference of discrimination.   *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).   If Plaintiff establishes a prima facie case, then United must articulate a legitimate, nondiscriminatory reason for its actions.   *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005).

Once United articulates a legitimate, nondiscriminatory reason for its actions, then Plaintiff must show that United's explanation is pretextual, *e.g.,* "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence." *Green v. New Mexico*, 420 F.3d 1189, 1192–93 (10th Cir. 2005). The Tenth Circuit has approved several means by which a plaintiff can meet this latter burden, such as evidence (1) the proffered reasons are false, (2) defendant acted contrary to written company policies addressing the action to be taken by defendant under the circumstances, or (3) defendant acted contrary to unwritten policies or practices when terminating the plaintiff (*e.g.*, through evidence plaintiff was treated differently than non-protected-class, similarly situated employees "who violated work rules of comparable seriousness"). *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). If the court's analysis progresses to the issue of pretext, "the presumption of discrimination created by the plaintiff's prima facie case 'simply drops out of the picture,' . . ., and '[t]he plaintiff then carries the full burden of persuasion to show that the defendant discriminated on the illegal basis of . . . gender.'" *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007).

Finally, a plaintiff cannot merely shoot holes in the employer's proffered explanation but must demonstrate that the weakness of the termination rationale is a coverup for disparate treatment based on gender. As the *Swackhammer* court stated, "the falsity of an employer's proffered explanation, or the existence of differential treatment, defeats summary judgment only if it could reasonably lead the trier of fact to infer a *discriminatory* motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate." *Id.* at 1168 (emphasis in original).

I am satisfied that Plaintiff meets her prima facie case for purposes of summary judgment. She worked for Defendant with a blemish-free record for over thirty years. She was terminated for conduct-related issues that objectively did not demand termination (such as, for example, a criminal act). Somehow, in an insulated work environment, in an industry centered on customer

service and public relations, a supposed long record of abusing subordinates failed to catch the attention of Defendant's upper management (despite an October 2016 anonymous complaint) until the matter of the Facebook posts came to light.  Defendant barred a potentially sympathetic manager (Plaintiff's supervisor) from participating in the investigation while permitting another potentially antagonistic manager (Mr. David, whose spouse faced discipline from Plaintiff) to make the termination decision.  Defendant refused to interview witnesses proffered by Plaintiff. And Plaintiff was terminated without Defendant utilizing progressive discipline.  These suffice for "circumstances giving rise to an inference of discrimination."

I am also satisfied that Defendant has met its burden of proffering a legitimate, nondiscriminatory reason for the termination.  The record establishes behavior by the Plaintiff that would violate both Defendant's employee conduct standards and those of any reasonable employer.

Defendant argues three bases for establishing it did not act pretextually.  First, Plaintiff's conduct "irreparably damaged her ability to lead her subordinates."  Mot. at 15.  Defendant has put forward evidence that its management honestly believed the complaints against Plaintiff arising from her treatment of subordinates.  Plaintiff does not dispute that the complaints were made or even that the decisionmakers believed in the complaints' veracity, only that the circumstances underlying each complaint could be explained by her intent to conscientiously supervise employees.

Second, Defendant argues it was following the UAL Guidelines prohibiting the harassment of United employees for any reason and in proceeding directly to termination based on the breadth and egregiousness of Plaintiff's established violations.  Plaintiff disagrees that Defendant should have bypassed progressive discipline in this instance but does not refute that the UAL Guidelines

explicitly permitted immediate termination (or, indeed, that it would be contrary to the civil rights laws for any employer to be able to immediately terminate an employee under sufficiently egregious circumstances). I find that Plaintiff has not met her burden of persuasion in establishing that these two explanations of Defendant's decision are pretextual for discrimination.

Third, Defendant relies on the absence of any evidence that it acted contrary to any policies, whether written or not, in terminating Plaintiff. Plaintiff counters with allegations of similarly situated employees who were not terminated despite violating Defendant's policies. Several of Plaintiff's proffered comparators are too dissimilar to support her argument. One is a male who sent sexually suggestive texts to other employees and was permitted to resign and retain benefits. Defendant establishes that the text-receiving employees were not offended (although interestingly were concerned enough to report him). Another is a male who had "issues with his subordinates by holding them accountable," Resp. at 13, and was transferred to another position. This alleged comparator was in a different work area (ramp supervisor), and Plaintiff provides no information about him other than he had "issues." I cannot possibly find this person is a proper comparator on such a dearth of information.

Plaintiff puts forward one other male employee who she states had "job performance issues with servicemen" and "locked himself and another employee in an office and held them hostage." *Id.* This is closer to a situation that might call for immediate removal but fails as a valid comparator for several reasons. Defendant's explanation for its decision in terminating Plaintiff relies entirely on unacceptable management of others and the destroyed trust that resulted; this comparator employee's issues had nothing to do with that and, thus, he does not constitute an appropriate example of "similarly situated." Furthermore, Plaintiff's Response cites only Plaintiff's own deposition as support for the specifics of this comparator, which itself appears to be inadmissible

hearsay without any foundation for Plaintiff's personal knowledge under Fed. R. Evid. 602. *Hernandez v. Potter*, 371 F. App'x 896, 900 (10th Cir. 2010) (on summary judgment, inadmissible hearsay will not be considered). Moreover, I have no basis to find that Plaintiff's allegations are anything other than "shop talk" which has an insufficient foundation to be considered on summary judgment. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1405 (10th Cir. 1997). In any event, Plaintiff does not provide to me the cited deposition pages in support of this alleged comparator (pp. 16–17 of her deposition, while Exhibit 3 provided to the Court skips all pages between 14 and 38). Finally, there is no evidence that this person, or any other comparator, had the same supervisory personnel. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007).

Plaintiff next argues that the circumstances of her long employment and the suspicious nature of Defendant's conduct in the investigation demonstrate pretext. I cite these circumstances above in support of Plaintiff's prima facie case. However, at the pretext analysis stage, the Tenth Circuit's decision in *Swackhammer* is instructive. As in the present case, the plaintiff there put forward problems with the employer's investigation but failed to carry the burden of persuasion that those irregularities supported an inference of discrimination. In that case, as here, I agree the employer could (or maybe should) have done it differently. Perhaps Plaintiff should have been afforded more process by having her witnesses questioned; maybe Mr. David should have been excluded from the investigation just as Plaintiff's supervisor was; maybe the termination decision was an overzealous application of the UAL Guidelines in reaction to the super sensitized treatment of those issues in American society; and so on. But courts "must keep in mind, however, 'our role is to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments.'" *Simon v. City & Cty. of Denver*, 781 F. App'x 793, 797 (10th Cir. 2019) (citation omitted). Here, as in *Swackhammer*, Plaintiff "does not draw

into question whether [United] actually relied, honestly and in good faith, upon the appearance of improprieties arising from the evidence gathered in [the] investigation[]."  493 F.3d at 1170.

There is an insufficient basis on this record for a rational jury to find discrimination based on gender. The civil rights laws do not mandate a fair investigation for employees, but only that the Defendant's decision-making process be free from illegal discrimination.  *Id.* ("'The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.'") (citation omitted); *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification.").

Therefore, summary judgment on the claims of gender discrimination is required.

## II.     Age Discrimination (Claims 2 and 5)

The *McDonnell Douglas* framework for a termination-based-on-age claim requires the plaintiff to show she was a member of the protected class (over forty years old), suffered an adverse employment action (here, termination), and the challenged action occurred under circumstances giving rise to an inference of age discrimination.  *E.g.*, *Laul v. Los Alamos Nat'l Labs.*, 714 F. App'x 832, 836 (10th Cir. 2017).  Plaintiff's only evidence in support of her prima facie case is the same similarly situated allegation identified above.  For the same reasons as her gender claim, her age claim fails on summary judgment.

## III.    Stored Communications Act (Claim 3)

The Stored Communications Act (SCA) prohibits "intentionally access[ing] without authorization a facility through which an electronic communication service is provided or intentionally exceeds an authorization to access the facility." 18 U.S.C. § 2701(a)(1)-(2).  To

establish this statutory claim, Plaintiff must offer sufficient evidence to allow the jury to conclude that Defendant knowingly, intentionally, or purposefully accessed Plaintiff's stored communications without authorization.

Critical for this Court's analysis is that the SCA prohibits "obtaining or altering access without authorization." *Bovino v. MacMillan*, 28 F. Supp. 3d 1170, 1177 (D. Colo. 2014). Defendant submits admissible and uncontroverted evidence that it never accessed Plaintiff's Facebook private account despite Plaintiff having spontaneously given (without request) Defendant her login information. Plaintiff does not even address this fact. Without actually accessing private electronic information, the SCA is not violated. The only case cited by Plaintiff is *Pietrylo v. Hillstone Rest. Grp.*, CIV.06-5754(FSH), 2009 WL 3128420, at *2 (D.N.J. Sept. 25, 2009), which did not involve a defendant who denied accessing plaintiff's information.

Therefore, summary judgment must be granted on the SCA claim.

### IV.    Colorado Lawful Off-Duty Activities Statute (LODAS) (Claim 4)

Under Colo. Rev. Stat. § 24-34-402.5: "It shall be a discriminatory or unfair employment practice for an employer to terminate the employment of any employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours . . . ." This law "was meant to provide a shield to employees who engage in activities that are personally distasteful to their employer, but which activities are legal and unrelated to an employee's job duties." *Marsh v. Delta Air Lines, Inc*., 952 F. Supp. 1458, 1462 (D. Colo. 1997). In support of this claim, Plaintiff contends she was terminated because of her private activity in posting material to her own Facebook account.

Defendant first argues that the record contains no evidence Plaintiff was terminated for her Facebook activity. I disagree. The termination letter dated October 16, 2017 begins with the

statement that Plaintiff posted "inappropriate and racially insensitive" material to her Facebook account. It states that this posting "was a clear violation of our United Social Media Policy and the [UAL] Guidelines." It informs her that, as a result of the Facebook post, she was being disciplined and investigated. The letter also accuses Plaintiff of "continu[ing] to deny that the racially insensitive Facebook post was inappropriate and that there was anything wrong with posting the racially offensive video on Facebook, where a number of your direct reports could see it." Next, the letter lists six distinct reasons why Defendant believed Plaintiff violated the above-identified policies. Most of these reasons would apply equally to the Facebook posts as they would to Plaintiff's direct interactions with subordinates. Finally, the letter states Plaintiff has broken the trust Defendant placed on her, while explaining that Plaintiff will not be given progressive discipline because the "progressive discipline process is based on changing behavior but that is not possible if you do not acknowledge that what you did was wrong and take ownership of your offensive and inappropriate behavior." Again, the letter directly accuses Plaintiff of denying the inappropriateness of the Facebook activity. Whether the Facebook posts were a contributing factor in the termination is a disputed material fact.

Defendant next relies on a statutory exception permitting the prohibition of conduct relating "to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer." *Id.* § 24–34–402.5(1)(a). The UAL Guidelines cited by Defendant apply to all employees, not just supervisory. However, Defendant proffers the deposition testimony of two management officials for the proposition that it "holds its supervisor-level and other leadership employees to a higher standard because those employees are the ones who need to set the example of appropriate conduct and to create and to foster an environment of dignity and response among employees." While it may be true United holds

supervisors to a higher standard in some respects, that cannot change the plain meaning of a statute. If an employer's policies explicitly apply to "all employees," I cannot find, as a matter of law, that the statutory language of the exception has been met.  As Judge Daniel stated in the *Marsh* case, "The fact is this portion of the statute was probably crafted to allow employers to require certain high profile members of their staff from foregoing involvement in activities that would call into question their competence."  952 F. Supp. at 1463. The problem is Defendant's attempt to shoehorn its after-the-fact "higher standard" testimony into a statutory exception allowing an employer to "require *certain* high profile members . . . from foregoing involvement in activities."  Just as Judge Daniel stated that "[p]romotion of a positive image for Delta is not the exclusive province of baggage handlers," *id.* at 1464, so too is the prohibition of racially offensive conduct not exclusively for supervisors. The current situation is unlike those cases that have applied this exception.

For example, in *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 593 (10th Cir. 2019), the employer specifically instructed the employee *in advance* not to publish certain material that might present a conflict of interest with the employer.  The employee proceeded with the publication in direct disregard of the employer's unambiguous prohibition.  The Tenth Circuit found that this circumstance fell within the statutory exception, as the employee disobeyed a direct order from his employer.

In *Jeffers v. Denver Pub. Sch.*, No. 16-cv-02243-CMA-MJW, 2017 WL 2001632, at *9 (D. Colo. May 11, 2017), *report and recommendation adopted*, No. 16-cv-02243-CMA-MJW, 2017 WL 5441612 (D. Colo. June 1, 2017), the activity at issue involved an employee calling a human resources representative a "bitch" during a telephone call.  Obviously, such activity may not even qualify as "off duty" since it involved direct interaction between two employees.

Furthermore, the Colorado Court of Appeals has interpreted the statutory exception as applying to activities that are inherently connected with employment and emanate from the particular duties of the plaintiff's job.  *Williams v. Rock-Tenn Servs., Inc.*, 370 P.3d 638, 643 (Colo. App. 2016). "Such activities and responsibilities must be unique to or within the exclusive province of the particular employee or group of employees." *Id.* (citing *Marsh*).  In *Williams*, plaintiff was the manager of a cardboard manufacturing plant.  The plant failed an internal audit.  Corporate management scheduled a meeting to discuss the audit with plaintiff.  Instead of attending the meeting, plaintiff went on vacation and was fired as a result.  The court held, unremarkably, that attending such a meeting was an inherent requirement of a plant manager's job: "LODAS is designed to protect employees from termination for private, personal activities, not from adverse employment consequences resulting from going on a vacation that conflicted with a meeting reasonably and rationally related to the party's employment." *Id.*

To allow Defendant's construction of the statute to prevail under these facts, "the exception would swallow the general rule." *Marsh*, 952 F. Supp. 1463–64.  United Airlines is not unique by any means in prohibiting employees from race-derogatory conduct.  To the extent Plaintiff can prove to a jury that Defendant relied on Plaintiff's on-duty conduct in the termination, this statutory exception will not apply.  Indeed, the statute shields employees "who engage in [off-duty] activities that are personally distasteful to the employer, but which activities are legal and unrelated to an employee's job duties." *Id.* at 1462.

This will be a matter for a jury to decide.  Thus, summary judgment is not appropriate on this claim.

## V.      Colo. Rev. Stat. § 8-2-108 (Claim 6)

This statute prohibits an employer from terminating an employee for "engaging in or participating in politics" or "political activity."  Defendant assumes for purposes of summary judgment that the conduct in question (supporting the Rebels mascot, commenting on the meaning of the Confederate flag) constitutes political activity under the statute.  Defendant's only argument on summary judgment is that Plaintiff was not terminated because of her Facebook posts.  I have already determined that the basis(es) for her termination creates a fact issue.  Therefore, summary judgment is inappropriate on this claim.

## VI.     Wrongful Discharge in Violation of Colorado Public Policy (Claim 7)

Colorado courts recognize a judicially created cause of action for wrongful discharge in violation of public policy. *DeFazio v. Starwood Hotels & Resorts Worldwide, Inc.*, 554 F. App'x 692, 694 (10th Cir. 2014).  *See Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524 (Colo. 1996) ("The identification of the statutory or constitutional provisions that qualify as clear expressions of public policy is a matter for judicial determination.").  Such a claim typically has required the plaintiff to prove various elements including, among other things, that "the employer directed him to violate some specific statute, regulation, or professional code related to public health, safety or welfare, or some clearly expressed public policy related to his responsibility as a citizen or his rights or privileges as a worker, or prohibited him from performing a public duty." *DeFazio*, 554 F. App'x at 694 (citation omitted).  Examples of some qualifying conduct include a certified public accountant's claim she was fired for refusing an employer's request to violate professional accounting conduct rules, *Mariani*, 916 P.2d at 525 ("[W]e hold that professional ethics codes may in certain circumstances be a source of public policy."); an employee's claim that her employer instructed her to not claim mileage for official travel in

violation of Colorado Wage Claim Act, *Hoyt v. Target Stores, Div. of Dayton Hudson Corp.*, 981 P.2d 188 (Colo. App. 1998); and an employee's claim of discharge for refusing to violate Colorado Consumer Protection Act and Motor Vehicle Repair Act, *Jones v. Stevinson's Golden Ford*, 36 P.3d 129 (Colo. App. 2001).

The circumstances under which a public policy violation might be found was "somewhat expanded" in *Lathrop v. Entenmann's, Inc*., 770 P.2d 1367 (Colo. App. 1989) to include not only situations in which an employee prospectively violates an employer's illegal directives, but also for employer retaliation against conduct in which the employee has already engaged. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 108 (Colo. 1992) (en banc) (adopting the expanded standard). However, in *Lorenz* the Colorado Supreme Court still required the plaintiff to prove, as part of a prima facie case, that the employer "prohibited the employee from performing a public duty or exercising an important job-related right or privilege." *Id.* at 109. Fact scenarios discussed in *Lorenz* included termination based on an employee's filing a claim for worker's compensation benefits or for serving on a jury. That court has also stated that the public policy undergirding such a claim must involve a "matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer, leads to an outrageous result clearly inconsistent with a stated public policy, or 'strike at the heart of a citizen's social rights, duties, and responsibilities.'" *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540 (Colo. 1997). In that case, the court held that firing an employee for calling the Colorado Division of Labor and complaining that her employer was attempting to eliminate her rest breaks did not state a claim. For this exception to apply, the public policy must relate to behavior that has such an impact upon the public that interference with an employer's business decisions is justified. *Mariani*, 916 P.2d at 525. "In addition, public policy must be clearly mandated such that the acceptable behavior is

concrete and discernible as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior." *Id.*

I could find no Colorado state court cases applying the public policy wrongful discharge analysis to a free speech theory brought by a nonpublic employee.  In *Johnson v. Jefferson Cty. Bd. of Health*, 662 P.2d 463 (Colo. 1983), the Colorado Supreme Court recognized that while a public employee's job may be "at will," the governmental employer "nevertheless may not discharge that employee in retaliation for the exercise of his free speech rights."  *Id.* at 472. Recognizing that the First Amendment is a limitation on *government*, the court held that for "policymaking" public employees, the courts employ a balancing test to determine whether "any infringement on the efficiency of governmental functions is outweighed by the employee's interest in commenting on matters of public concern."  *Id.* at 474.  Specifically, "the public statements of a policymaking employee may be a basis for dismissal or discharge when the [free speech] statements are such as to materially undermine the overriding governmental interest in the effective administration of its programs."  *Id.* This decision was rendered prior to Colorado courts creating a claim for public policy wrongful discharge, but the "free speech retaliation discharge" theory is conceptually the same.

In *Maxfield v. Bressler*, 20 F. Supp. 3d 1084, 1093–94 (D. Colo. 2013), Judge William Martinez found that a public employer's actions in terminating an employee who was trying to bring concerns regarding the expenditure of public funds to an elected official "violate[d] the individual rights established in the First Amendment, which undermines 'a clearly expressed public policy relating to [his] basic responsibility as a citizen.'"  Like *Johnson*, this case involved a governmental employer.  Judge Martinez did not discuss the policymaking/nonpolicymaking distinction but did note that the employer's actions *violated* the First Amendment (while a private

employer's actions, I would note, even if offensive in a public policy sense, cannot violate the Constitution in this context).

I could find no Colorado decision (or federal court applying Colorado law) approving the public policy wrongful discharge analysis in a pure free (or political) speech context. *Cf. Jaynes v. Centura Health Corp.*, 148 P.3d 241, 247 (Colo. App.), *as modified on denial of reh'g* (June 29, 2006) ("[N]o Colorado Supreme Court opinion has upheld a public policy wrongful discharge claim absent a statutory crime, employee right, or public duty."). That alone should be dispositive on whether summary judgment is appropriate, because as a judicially created remedy by the Colorado courts, expansion of such a claim should be determined by those courts and not by federal courts sitting in diversity jurisdiction.[1]  Importantly, the vast majority of jurisdictions have found that in these circumstances an employee has no claim for public policy wrongful discharge. "The prevailing view among the majority of courts addressing the issue is that state or federal constitutional free speech cannot, in the absence of state action, be the basis of a public policy exception in wrongful discharge claims." *Jackson v. Am. Elec. Power Serv. Corp.*, No. CV 3:04-0473, 2005 WL 8159165, at *4 (S.D.W. Va. July 29, 2005) (collecting cases).  "[The court's] research has failed to uncover any state court that has so applied state constitutional free speech principles to private employers. Likewise, we have discovered no federal court which applies the First Amendment Free Speech Clause to private employers." *Id.  See Sharp Corp. v. Hisense USA Corp.*, 292 F. Supp. 3d 157, 179 (D.D.C. 2017) ("These decisions stand for the proposition that,

---

[1] The United States Supreme Court has stated its "general reluctance to extend judicially created private rights of action . . .  because 'the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability.' . . .  This caution extends to the question whether the courts should exercise the judicial authority to mandate a rule that imposes liability upon artificial entities like corporations." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402–03 (2018) (citations omitted).

even when a plaintiff asserts a general public-policy argument, the First Amendment does not apply outside of state action . . . .  [T]he government-action requirement is not some technicality with which plaintiffs can dispense by cloaking their claims in the guise of 'public policy.'").

Furthermore, Colorado courts disallow the application of the public policy wrongful discharge remedy when a statute already provides the plaintiff a wrongful discharge claim.  *Caspar v. Lucent Techs., Inc.*, 280 F. Supp. 2d 1246, 1249 (D. Colo. 2003).  In this Order I have already concluded that LODAS provides such a remedy here.

For these reasons, Plaintiff's public policy wrongful discharge claim must be dismissed.

## VII.     Implied Contract of Employment (Claim 8)

Colorado is an "at will" employment state.  However, "[o]perating from the premise that parties are free to require cause for termination, Colorado also recognizes that an employer's failure to follow termination procedures contained in an employment manual can serve as the basis for a breach of contract or promissory estoppel claim." *Wisehart v. Meganck*, 66 P.3d 124, 127 (Colo. App. 2002).  Plaintiff relies on the UAL Guidelines as forming the basis for her implied contract of employment claim.  However, the UAL Guidelines expressly state that (1) "United is an at-will employer," (2) United may "modify or termination at its discretion . . . an employee's employment status," (3) the UAL Guidelines "should [not] be interpreted  to . . . alter or modify the  at-will  employment  relationship,"  and  (4)  they  "are  not  a  contract  of  employment." Furthermore, as noted elsewhere in this Order, the UAL Guidelines expressly permit bypassing progressive discipline and proceeding directly to termination.  Plaintiff signed an affirmation that she understood that her "employment may be terminated by United Airlines or by [her] at any time[.]"  "If an employee seeks to rely on an employee handbook or other written policy of the employer as the basis for an implied employment contract claim, the employee must accept the

whole of that policy. The employee may not accept the favorable portions of the policy and reject the unfavorable portions." *Collins v. Colorado Mountain Coll.*, 56 P.3d 1132, 1134 (Colo. App. 2002). "[A]n employer's disclaimer of contractual obligations is effective 'if the employer has clearly and conspicuously disclaimed intent to enter into a contract limiting the right to discharge employees.'" *Sidlo v. Millercoors*, LLC, 718 F. App'x 718, 730 (10th Cir. 2018) (quoting *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997). Such is the case here.

No facts support an implied contract of employment here. Therefore, summary judgment is necessary on this claim.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [filed September 18, 2020; ECF 33] is **granted in part** and **denied in part**. Summary judgment is granted as to Plaintiff's gender discrimination claims (Claims 1 and 5), age discrimination claims (Claims 2 and 5), SCA claim (Claim 3), wrongful discharge in violation of Colorado public policy claim (Claim 7), and implied contract claim (Claim 8). Summary judgment is denied as to Plaintiff's LODAS claim (Claim 4) and unlawful prohibition of employee political activity claim (Claim 6).

Recognizing that this Order disposes of all federal laws claims, the Court notes that neither in the Complaint nor the Final Pretrial Order in this case did Plaintiff plead or assert diversity jurisdiction, under 28 U.S.C. § 1332. The Complaint does allege, in paragraph six, that Plaintiff is a citizen of Colorado. The Court kas knowledge that Defendant is not incorporated, nor does it maintain its principal place of business, in Colorado. The Court presumes the existence of diversity of citizenship and that the jurisdictional threshold of $75,000.00 in controversy can be plausibly asserted here (a termination case of a long-time employee). However, if either party

disputes the existence of diversity jurisdiction, the Court will permit ten days in which to bring the matter to the Court's attention.

Entered this 9th day of December, 2020, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge